| | | |
|---|---|---|
| **AJANAKU E. MURDOCK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **CHRISTINA THOMPSON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment, (Doc. No. 55), and a Letter filed by the *pro se* Plaintiff, (Doc. No. 64), that has been docketed as a Motion to Resubmit Response regarding Defendants' Motion for Summary Judgment.

## I.    BACKGROUND

The *pro se* incarcerated Plaintiff filed a civil rights suit pursuant to 42 U.S.C. § 1983 with regards to incidents that allegedly occurred at the Lanesboro Correctional Institution. The Complaint passed initial review on claims that several Defendants interfered with Plaintiff's right to send and receive mail. (Doc. No. 11). Defendants' Motion for Summary Judgment is presently before the Court for consideration.

**(1)**    **Complaint** (Doc. No. 1)

Plaintiff alleges in his verified Complaint that, around February 2014, he made an attempt to send registered or certified legal mail but that he was not permitted to do so because he was indigent. Plaintiff showed "every one of the defendants" in this case the mandatory steps he had to take in order to properly file a speedy trial motion. (Doc. No. 1 at 5). Plaintiff was constantly refused so he wrote a grievance stating that administrators were hindering his access to the judicial

1

system. This was "swept under the rug" like all of his grievances. (Doc. No. 1 at 5).

During this time, McAllister refused to give Plaintiff adequate notary services that are mandated by the law by refusing to put her seal on Plaintiff's legal papers. (Doc. No. 1 at 6). She has also thrown away letters from Plaintiff to his family and friends.

Because of Plaintiff's grievances and "constant complaints" about his mail situation, the "administrators" who are in control of the mail kept his mail from going out. (Doc. No. 1 at 7). Plaintiff was placed on a highly structured and restrictive gang lockup unit even though he is not a gang member and was told that all mail has to go out of the facility unsealed. Plaintiff sent Captain Mims, who is the supervisor of all gang activity at Lanesboro, a request on February 25, 2015. She responded that his mail was being sent out sealed like it should be. The following month, Captain Aaron sent out a memo delegating officers to pick up and pass out mail at specific times which caused more confusion.

When Plaintiff was no longer indigent, he was allowed to send out his mail certified. He did so because his loved ones were not receiving his mail. Plaintiff then began having more problems with Defendants Houser and Paul, who were holding some of his mail in the mailroom, which they admitted. They were also throwing away certified mail receipts and sending mail out as regular mail even though Plaintiff had paid. When Defendant Mabry got involved, he tried to lie for them, and said that the policy was being revised and this is now how they handle certified mail at the facility. Plaintiff submitted all of these statements through Edith Fultz and Unit Manager Lemon who cannot now find the copies Plaintiff submitted. Mabry changed the policies himself without having first sent a memo through the prison and no longer allows certified mail unless it is legal, even if inmates have the money to pay for certified mail.

Plaintiff has lost property and special items that can never be replaced and suffered mental

and emotional distress as a result.

He seeks injunctive relief, compensatory damages for mental and emotional suffering, punitive damages, and a jury trial.

**(2)** **Defendants' Motion for Summary Judgment** (Doc. No. 55)

Defendants argue that Plaintiff cannot come forward with evidence from which a reasonable jury could find by a preponderance of the evidence that Defendants violated his First Amendment rights by following NCDPS Policy and Lanesboro Standard Operating Procedures ("SOPs") regarding the handling of his mail. Alternatively, because no constitutional violation has been shown, Defendants are shielded in their individual capacities from Plaintiff's claim for damages.

**(3)** **Plaintiff's Response** (Doc. No. 63)[1]

Plaintiff attacks the adequacy of Defendants' factual representations and asks that the Motion for Summary Judgment be stayed because Plaintiff does not have adequate resources or sufficient opportunity to obtaining the necessary facts "due in part to Defendants not being forthcoming with Discovery Requests." (Doc. No. 63 at 1).[2]

**(4)** **Plaintiff's Motion to Resubmit Response** (Doc. No. 64)

Plaintiff argues, *inter alia*, that he filed his Response to Plaintiff's Motion for Summary Judgment in this case on July 18, 2019, but it was returned to sender because Plaintiff included the wrong zip code in the Court's address. Plaintiff asks the Court to permit him to re-file his Response in the interests of justice. Plaintiff's Motion will be granted insofar as his Response and supporting documents are accepted as timely filed.

---

[1] The Court entered an Order pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), notifying Plaintiff of the importance of responding to Defendant's Motion and the applicable legal standard. (Doc. No. 58).
[2] Plaintiff never filed a motion to compel discovery.

**(5)**     **Evidence**[3]

     **(A)**     **Declaration of Wesley Mabry** (Doc. No. 56-1)

Defendant Mabry worked at Lanesboro C.I. between August 2013 and June 2017 as Administrative Assistant II and Facility Head Designee.

Lanesboro has in place procedures for identifying outgoing legal mail to be processed daily, no matter what the inmate's trust fund account reflects. The mailroom makes every effort to identify outgoing correspondence as legal in case the inmate did not specify "legal" or a legal identifying title in the individual the mail being sent to. Lanesboro has two different procedures to allow indigent inmates to send legal mail: the canteen Cashless on the Net System ("CON") and Fiscal Policy .1100, Section .1106.

With regards to CON, NCDPS policy allows indigent inmates to get 10 indigent mail receipts from inmate canteen per month as long as the inmate meets indigent criteria. These receipts can be used for personal or legal mail. As long as the receipt has not expired, the inmate submits the indigent mail with the legal letter to the mailroom. The mailroom processes the receipt from the CON system and the first-class postage is paid by the canteen/welfare account. "Records indicate that [Plaintiff] was aware and utilized the canteen indigent mail receipts." (Doc. No. 56-1 at 2). This is evident in the mailroom/CON system reports that were processed daily. Comparing the "indigent tickets processed" reports to the Lanesboro mailroom legal mail log books of outgoing legal mail for February 3, 2015, "it can be concluded that [Plaintiff] was using his indigent mail receipts to send out legal mail." (Doc. No. 56-1 at 2). The processed dates of the indigent mail receipts report for February 3, 2015 corresponds to the same dates logged for Plaintiff's outgoing legal mail.

---

[3] This section is not exhaustive. The Court takes judicial notice of NCDPS Policy and Procedures and the Lanesboro C.I. SOPs. <u>See</u> Fed. R. Ev. 201.

The Fiscal Policy procedure for indigent inmates to send out legal mail states that every facility is supposed to keep unlimited amounts of indigent inmate stamps on hand for the legal mail of indigent inmates, whether or not the facility uses the CON system. This policy does not state that registered or certified mail is permitted for indigent legal mail. Lanesboro has the cashless canteen system, but the facility realized that individual outgoing legal mail can be several pages thick and the weight would make it a "package" under US Postmaster Regulations. (Doc. No. 56-1 at 3). In order to prevent outgoing indigent legal mail from being hindered or returned by the post office, Lanesboro allows outgoing indigent mail to be processed the same as outgoing indigent packages. This is covered by the Inmate Banking System ("IBS") Policy. Mailroom staff are not permitted to have the deposit and withdrawal profile for IBS so they cannot see an inmate's trust fund account. By processing indigent legal mail the same as outgoing packages, the additional first class postage is covered from the weight and it prevents the post office from returning legal mail to the facility. This procedure works identically to the CON inmate indigent mail receipt. If the inmate has funds in his account, it will withdraw the postage from the inmate's account. If the inmate is indigent, it withdraws postage from the welfare account. This procedure assured that indigent inmates only had to send their outgoing legal mail to the mailroom and it was processed "no matter what the circumstances may be." (Doc. No. 56-1 at 4).

This procedure was explained to Plaintiff in May 2014 in a grievance response from Mabry to Plaintiff on May 20, 2014. The grievance also pointed out that, if Plaintiff could provide justification for sending registered or certified legal mail, it would be considered.

In October 2015, Plaintiff began to "heavily utilize" this procedure for all his mailing needs. He was no longer indigent in 2015 and it was not understood why he would not purchase stamps, "but the facility continued to process the mail" which is why there are several "2PS"

transactions on his inmate trust account statement. (Doc. No. 56-1 at 4).

Certified mail is not permitted for indigent mail. Policy states that first class postage only is permitted. The fees for certified signature and return receipt are not covered in accordance with policy. The cost for certified mail can run from $6.00 to $8.00 per piece based on weight. Fiscal policy .1000 provides directives to safeguarding funds. This would be for inmate accounts and special accounts such as the welfare account in the IBS. This is to keep any account from being used for improper purposes.

Inmates who have money to send out certified mail would need to request the funds to be withdrawn from his trust account. This procedure is covered in the IBS under special draws. This policy states that the facility needs a signed request or inmate signature to withdraw funds from the inmate's account for any reason. The policy states that facilities need to use good judgment when approving and authorizing special draws for inmates.

Plaintiff was permitted to send mail out as certified mail. The purchase receipt was kept on file for the facility's audit purposes and a photocopy of the receipt was forwarded to Plaintiff. Plaintiff began to submit personal mail as certified mail, claiming he had the funds. Plaintiff was submitting birthday cards and personal letters to family and friends.

Mabry evaluated the procedures and it time it took the mailroom, trust fund and post office staff to process certified mail, after receiving several complaints from Plaintiff who had not received his return signature cards from the post office. "The facility, nor its mailroom, are able to determine when the signature cards would return to the facility, or even if the individual that the mail was sent to accepted or signed for the certified mail." (Doc. No. 56-1 at 6). However, "the mailroom made sure to forward the green signature cards to [Plaintiff] when they arrived in the incoming mail." (Doc. No. 56-1 at 6).

After careful evaluation and accordance to policy, Mabry "used good judgment and delimited certified mail to legal mail only." (Doc. No. 56-1 at 6). This was explained to Plaintiff in a memo on April 11, 2016 and a remedy response on June 13, 2016.

NCDPS policy, fiscal policy, and IBS policy do not address certified mail processing. The IBS policy does not address withdrawing funds from an inmate's account or a safeguard account (welfare) where it states the facility head or designee has the ability to authorize funds being withdrawn. The introduction to the IBS Policy Manual states that the manual supersedes policy until policy is rewritten, meaning that the "procedures outlined in the IBS Policy supersedes Fiscal Policy and NCDPS Policy." (Doc. No. 56-1 at 6).

Lanesboro has not violated any of Plaintiff's rights. The facility has "suffered thru his constant allegations of wrong doing for years and no matter how we try to work with [Plaintiff], he is still not content." (Doc. No. 56-1 at 6). Lanesboro staff and administration prides itself on being fair in all of its dealings with inmates. "The allegation that Lanesboro refused to authenticate legal mail property, threw away letters, and refused to send legal mail certified due to Plaintiff's indigent status is 100% not true." (Doc. No. 56-1 at 7).

Mabry denies that he "ever knowingly or willfully acted in any manner intended to deprive this inmate of any right secured to him under the laws of the State of North Carolina or the Constitution and laws of the United States." (Doc. No. 56-1 at 7).

**(B)** **Declaration of Donna Houser** (Doc. No. 56-15)

Defendant Houser is a Processing Assistant IV in the mailroom at Lanesboro C.I. "At no time did [she] keep [Plaintiff's] mail from being mailed out, nor keep [him] from receiving his daily mail, when it was mailed to [him]." (Doc. No. 56-15 at 1). At no time did they "ever hinder any legal mail from going out or coming in." (Doc. No. 56-15 at 1).

The mailroom keeps a daily log of inmates' incoming and outgoing mail in a DC-218 book. The only mail that Plaintiff was not allowed to receive was "pornographic in nature" and appears on the Statewide Master List of Disapproved Publications." (Doc. No. 56-15 at 1).

Houser denies that she ever "knowingly or willfully acted in any manner intended to deprive this inmate of any right secured to him under the laws of the State of North Carolina or the Constitution and laws of the United States." (Doc. No. 56-15 at 2).

**(C)**     **Affidavit of Miranda Mimms** (Doc. No. 56-18)

Mimms is Correctional Captain III at Lanesboro C.I., where she has direct access to Offender Population Unified System records ("OPUS"), an electronic database containing comprehensive inmate records. Between June 2015 and May 2016, Mimms was the Security Risk Captain at Lanesboro and, as such, she monitored Security Risk Groups ("SRG") and their suspected and confirmed members or associates in an effort to protect the safety of the inmates and staff at Lanesboro. She is familiar with the Department's policy regarding the sue of mail by inmates. Plaintiff was an inmate at Lanesboro from September 25, 2013 to November 1, 2018.

Department use of mail policy allows certain limitations on incoming and outgoing mail where there is a reasonable belief that such limitation is necessary to protect public safety or institutional order and security. The use of mail policy provides for the inspection of incoming and outgoing mail in order to prevent the receiving or sending of material that threatens to undermine the security and order of the facility or mail that contains contraband or other unlawful materials.

In an effort to protect the safety of the inmates and staff at Lanesboro, Lanesboro opens or unseals ("scans") mail for all inmates classified as affiliated with any gang or listed as SRG. (Doc. No. 56-18 at 2). Inmates that are validated or suspected of being SRG members or associates are not permitted to send outgoing mail that is sealed. Upon admission to Lanesboro, if an inmate has

already been designated in OPUS as a validated or suspected SRG member or associate, then the inmate is verbally informed of the prohibition on sealed outgoing mail. If an inmate that is either validated or suspected of being an SRG member or associate attempts to send outgoing mail that is sealed, the mail is rejected and archived at the facility. When outgoing mail is rejected because it was sealed and sent by such an inmate, that inmate is notified of the rejection by written memorandum.

Lanesboro randomly scans personal mail for inmates not classified as SRG unless there is a reason to believe the inmate is attempting to circumvent policy by mailing or receiving a particular letter. Personal mail may be read, censored, or rejected based on legitimate institutional interests of order and security.

While at Lanesboro, Plaintiff was not classified as SRG. There is no specific unit for SRG members, and offenders classified as SRG are intermingled throughout the facility.

It is not policy for employees handing mail at Lanesboro to throw away an inmate's mail or receipt for certified mail. Inmates are allowed to send mail certified so long as they have the funds in their inmate trust account. Otherwise, outgoing mail intended as certified is returned to the inmate along with a written memorandum that adequate funds were not available in the inmate's trust account. If an inmate is indigent and has outgoing mail that is marked legal, funds are paid through the inmate welfare fund. The inmate welfare fund will provide postage for regular mail, not certified mail. Certified mail is only sent if the inmate has money in his inmate trust account.

If there is a question as to whether an addressee fits the definition of legal mail, the letter/package may be held for not more than 24 hours to resolve the question.

Lanesboro has a censorship policy for inmate mail and publications with content that

threatens to undermine the security and order of the facility. The censorship policy includes reasons such as sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution or facilitates criminal activity. Known publications that meet the criteria for censorship are placed on a disapproval list. If an inmate receives a publication that is on the disapproval list, the publication is returned to the sender, and the inmate and sender are both sent a written memorandum, "disapproval letter," that the publication has been disapproved and the reason for the disapproval. (Doc. No. 56-18 at 4). Lanesboro has an appeal process for the disapproval.

The Correction Administrator I is the only person at Lanesboro to change an inmate mail policy.

Outgoing mail is picked up at least once each weekday and taken to the post office. Incoming inmate mail is received at least once each work day from the post office when outgoing mail is sent. Because Lanesboro's close and medium security facility has more than 1,500 inmates, and its minimum security facility has more than 350 inmates, although mail is retrieved from the post office on a given day, it has to be processed and all unrejected and approved mail is then delivered to inmates the following work day. One purpose for processing mail is to "prevent inmates from sending or receiving material that threatens to undermine the security and order of the facility or mail that contains contraband or other unlawful material." (Doc. No. 56-18 at 4).

Incoming mail is normally delivered to inmates by employees on the evening shift. The process of delivering incoming mail to inmates is known as "pass out." (Doc. No. 56-18 at 5). When inmates have outgoing mail, although the mail is received from inmates on a given day for the purpose of mailing, outgoing mail also has to be processed then taken to the post office for mailing the following work day. The process of receiving mail from inmates for purposes of

outgoing mail is known as "pick up." (Doc. No. 56-18 at 5).

Barring an emergency situation, weekends, holidays, an inmate's temporary absence from the facility for reasons such as court or medical treatment, questions about the status of mail marked as legal mail, or archival of rejected mail, Lanesboro does not hold inmate mail. (Doc. No. 56-18 at 5). Any incoming inmate mail with an addressee whose name is incomplete such that the inmate cannot be located will not be unsealed and will be returned to sender.

**(D)**     **Declaration of Elizabeth Paul** (Doc. No. 56-20)

Paul is Processing Assistant IV at Lanesboro C.I. Paul logged Plaintiff's incoming and outgoing mail into the Lanesboro mail log book. "Half of the time, [Plaintiff] was on the indigent list, and the other half he was not, due to him having money." (Doc. No. 56-20 at 1). When Plaintiff was not indigent "he had to purchase postage with his own funds for certified legal mail." (Doc. No. 56-20 at 1).

Paul "did not throw away any of his certified return receipts." (Doc. No. 56-20 at 1). She "always put his certified return receipts, with his name on an envelope, addressed to where he was sleeping (housing unit)." (Doc. No. 56-20 at 1).

The mailroom keeps a daily log of inmates' incoming and outgoing mail in a DC-218 book.

Paul "den[ies] that [she] ever knowingly and willfully acted in a manner intended to deprive this inmate of any right secured to him under the laws of the State of North Carolina or the Constitution and laws of the United States." (Doc. No. 56-20 at 2).

**(E)**     **Declaration of Donna McAllister** (Doc. No. 56-21)

McAllister is Administrative Associate II (Special Affairs) at Lanesboro. From April 2014 through February 2018, she was Processing Assistant III on Richmond Unit. McAllister "did not work in the mailroom," had "no control over the mail," and "did not handle or sort offender mail."

(Doc. No. 56-21 at 1). The mail was dropped in the lobby mail box for the mail room to be processed by the outgoing night shift and delivered to the incoming night shift.

McAllister did not throw away mail or items sent by Plaintiff's family. McAllister has "no reason to throw away any offender's mail or property." (Doc. No. 56-21 at 1). McAllister "den[ies] that [she] ever knowingly and willfully acted in a manner intended to deprive this inmate of any right secured to him under the laws of the State of North Carolina or the Constitution and laws of the United States." (Doc. No. 56-21 at 2).

**(E)** **Declaration of Christina Thompson** (Doc. No. 56-22)

Thompson was Processing Assistant IV at Lanesboro C.I. in the mailroom from June 2014 until June 2015. Prior to that she was a correctional sergeant.

All incoming and outgoing legal mail was logged into a Legal Mail Log Book. There was a separate book for each. Thompson followed DPS policy and procedures as well as Lanesboro SOP.

Inmates who are indigent have their legal mail paid for by the inmate's welfare fund. "No one was ever denied postage to mail 'legal mail.'" (Doc. No. 56-22 at 1).

Plaintiff filed his grievance concerning the mailroom before Thompson began working in the mail room. (Doc. No. 56-22 at 1). Thompson "never denied him mailing his legal mail while [she] was working the mail room." (Doc. No. 56-22 at 2). She "never destroyed his mail, prevented him from receiving any publication, or denied mailing his property, per DPS policy and procedure and Lanesboro SOPs." (Doc. No. 56-22 at 2).

Plaintiff received 10 indigent stamps a month to mail out what he wanted as long as what he wanted to mail was allowed per policy. The mailroom did not control the contents of his mail or his personal property. That was handled by the housing unit, which brought items to the

mailroom he already sealed with the proper form attached. If Plaintiff did not have enough stamps or money to mail his personal items, they were not mailed and the unit would be notified to come get it and take care of it with the inmate.

Thompson was a sergeant, not working in the mailroom, and on medical leave in September 2013 when Plaintiff states the allegations started because he was denied correspondence with his younger brother. Thompson has no knowledge of this.

Thompson was a sergeant on light duty in February 2014 when Plaintiff states he showed her "the mandatory steps I had to take in order to properly file a 'motion for speedy trial', etc." (Doc. No. 56-22 at 2). Plaintiff did not show Thompson anything because she did not work in the mailroom at that time.

Thompson left the mailroom in June 2015 so she has no knowledge about Plaintiff's allegation that he was not getting his publications in the latter part of 2015.

Contrary to Plaintiff's assertions, Thompson was not the "legal mail carrier." (Doc. No. 56-22 at 3). Thompson worked in the mailroom as a Processing Assistant IV. If Thompson processed Plaintiff's legal mail, she did so following DPS policy and procedure and Lanesboro SOPs. Thompson "never denied him postage because he was indigent." (Doc. No. 56-22 at 3). If policy said he could have mail certified as an indigent, Thompson would have done so.

Thompson "den[ies] that [she] ever knowingly and willfully acted in a manner intended to deprive this inmate of any right secured to him under the laws of the State of North Carolina or the Constitution and laws of the United States." (Doc. No. 56-22 at 3).

**(F)      Plaintiff's Affidavit** (Doc. No. 63 at 16)

Plaintiff states in his unverified "affidavit" that he had "major issues regarding [his] mail and property" at Lanesboro C.I. consistently between 2013 and 2018. (Doc. No. 63 at 16). Valuable

items such as legal mail, photographs, poetry transcripts and "books [he has] written pertaining to the corruption in N.C. Prisons." (Doc. No. 63 at 16).

Plaintiff respectfully reached out to the "proper staff members" but "most either lied in their responses or gave [him] the runaround." (Doc. No. 63 at 16). These defendants "have retaliated against [him] in ways such as, 1) moving [him] to a more restrictive unit for gang members or prisoners who are classified as "S.R.G." …, destroying [his] mail, property (or conveniently losing or misplacing them) and outright refusing [his] publications or the privilege to send certified mail legally as an indigent prisoner even while [he] showed the need for that service." (Doc. No. 63 at 16).

Plaintiff disputes the following assertions by Defendants:

1 – That they've never lied

2 – That they've never refused to allow [Plaintiff] to send out legal mail as an indigent prisoner.

3 – That they've always upheld policy and procedure and haven't violated [his] 1st Amend Rights.

4 – [T]heir defense in saying they've never thrown [his] mail away.

5 – [T]heir defense utilizing IBS Policy and Special Draw Policy, which [Plaintiff will] attack when addressing Defendant Mabry.

6 – Defendants left out vital information regarding how indigent mail is processed. [He] knows this because [he] has receipts and responses from someone in the Trust Fund who was charging [Plaintiff] for mail when [he hasn't] mailed anything or either billing [him] for it….

7 – Defendants also objected to a log of [Plaintiff's] discovery requests which would lead to more facts exposing them and the violations they've committed against [him].

8 – Once [Plaintiff] completes [his] entire opposition to Defendants Motion for Summary Judgment [the court] will see that their regulations/violations weren't reasonably related to a 'legitimate, neutral government interest' … their regulation/violation didn't leave open another way for [Plaintiff] to exercise [his]

constitutional rights … this was also a systemic problem affecting other prisoners mail….

(Doc. No. 53 at 17-18).

    **(G)**    <u>**Time Line**</u>

1/14/14    <u>Request for Information</u> to Mailroom Supervisor: Plaintiff needs notarized legal mail sent out certified/registered, time is of the essence; Staff Response by E. Paul 1/15/14: "Send your envelope up here to be weighed. Fill out the form. DO NOT PUT ON ENVELOPE. Mailroom will place them. Any questions ask the Unit Secretary." (Doc. No. 63-6 at 35)

1/31/14    <u>Outgoing Mail Log</u> (legal) to NCPLS (Doc. No. 56-6 at 11)

        <u>Outgoing Mail Log</u> (legal) to NCPLS (Doc. No. 56-6 at 11)

        <u>Outgoing Mail Log</u> (legal) to Combined Records Raleigh (Doc. No. 56-6 at 11)

        <u>Outgoing Mail Log</u> (legal) to Attorney At Law Paul Herzog (Doc. No. 56-6 at 11)

        <u>Outgoing Mail Log</u> (legal) to Clerk of Superior Court (Doc. No. 56-6 at 11)

2/4/14    <u>USPS</u> certified mail card filled out by Plaintiff, addressed to Clerk of Court - District Attorney (Sarah Kirkman) with handwritten note by Sgt. Thompson: "**The state will not pay for certified mail when you are indigent**. **You can mail it as indigent, regular legal mail**." (Doc. No. 63-6 at 56-57) (emphasis added)

2/7/14    <u>Outgoing Mail Log</u> (legal) to Iredell County Courthouse (Doc. No. 56-6 at 12)

        <u>Outgoing Mail Log</u> (legal) to Iredell County Courthouse (Doc. No. 56-6 at 12)

2/18/14    <u>Outgoing Mail Log</u> (legal) to NCPLS (Doc. No. 56-6 at 13)

        <u>Outgoing Mail Log</u> (legal) to NC Innocence Injury Com. (Doc. No. 56-6 at 13)

        <u>Outgoing Mail Log</u> (legal) to Baucom Clayton & Benton (Att) (Doc. No. 56-6 at 13)

        <u>Outgoing Mail Log</u> (legal) to Mary Rodgers (Att) (Doc. No. 56-6 at 13)

        <u>Outgoing Mail Log</u> (legal) to Chris Shelburn (Att) (Doc. No. 56-6 at 13)

        <u>Request for Information</u> to Ms. Penland (Case Manager): "Thanks for trying … Need to talk to you concerning other mail log as well.... I've written a grievance about the corresponding issue but I never received my copy of it. I also need the

legal form I been asking about;" Staff Response by C. Penland 2/21/14: "You need to write the clerk of court to request a speedy trial. Also, any questions you have should be submitted on a request. I do not have any part of the grievance process." (Doc. No. 63-6 at 36)

2/25/14     <u>Outgoing Mail Log</u> (legal) to Clerk of Court Statesville (Doc. No. 56-6 at 14)

2/27/14     <u>Letter</u> from Plaintiff to Combined Records: NCPLS advised Plaintiff to write to combined records in case the facility did not have the NCDPS form and certificate DC-215, memorandum of inmate speedy trial, which they do not. Case manager does not know what it is. Plaintiff already tried to get motions sent off as certified mail "BUT I'm indigent so this facility refused to do it;" **Plaintiff had the two motions notarized** and signed by Sgt. Shaw as verification that Plaintiff mailed off the motion but that is not a guarantee it will get filed properly; Plaintiff then wrote the clerk of court for copies of the motions to no avail; Plaintiff feels he is getting the runaround; Plaintiff requests help; "Time is of the essence and I know these officials are taking advantage of this." (Doc. No. 63-6 at 38) (emphasis added)

            <u>Request for Information</u> to Sgt. Thompson: Plaintiff tried to send certified mail as an indigent but Thompson wrote back saying Plaintiff couldn't; wants to know if he can send these documents registered mail as an indigent; "I have to send it off this way so it will be a legal document;" needs certificate DC-215 form to mail with his request for a speedy trial; Staff Response by Houser 3/3/14: "All indigent legal mail is sent out as 1st class postage. **Indigent inmate cannot send out certified/return receipt**" (Doc. No. 63-7 at 13) (emphasis added)

3/12/14     <u>Letter</u> from Plaintiff to C. Penland: Plaintiff asks for help because he has DVDs going to churches motivational speaking and reciting his poetry; Plaintiff came into a lot of money but got "played" by family and friends and now he does not have "a pot to piss in" (Doc. No. 63-6 at 40)

4/23/14     <u>Canteen Receipt</u> indigent first class mail (Doc. No. 56-4 at 1)

4/25/14     <u>Cashless on the Net</u> one first class stamp (Doc. No. 56-5 at 2)

4/28/14     <u>Cashless on the Net</u> one first class stamp (Doc. No. 56-5 at 3)

4/30/14     <u>Cashless on the Net</u> two first class stamps (Doc. No. 56-5 at 4)

5/23/14     <u>Request for Information</u> to McAllister (Secretary): Plaintiff explaining he has no more paper and envelopes, is hindering him from the legal process, **needs a notary** for legal papers [no staff response] (Doc. No. 63-6 at 32) (emphasis added)

5/28/14     <u>USPS</u> certified mail card filled out by Plaintiff, addressed to Sarah Kirkman, checked "Return Receipt Fee (Endorsement Required)" (Doc. No. 63-7 at 3)

5/29/14          <u>Request for Information</u> to Mailroom Supervisor: Plaintiff attempted to send off privileged legal mail as indigent and it was returned saying "Can't do certified mail;" wants to know if he can send it registered; "these are the only ways the courts will accept these documents….;" Staff Response 6/3/14 by Thompson: "**We can place regular postage on all of your outgoing legal mail but we cannot pay to send it certified**. **If you have a letter from the court you would need to show that to try to get it approved as an exception.**" (Doc. No. 63-7 at 14) (emphasis added)

6/18/14          <u>Request for Information</u> to C. Smith (Case Manager); thanking Smith for getting his lawyer's address; nobody came to see Plaintiff on 5/8/13; Plaintiff got a bogus rule violation; Plaintiff asked for information in a letter about an indictment which combined records told Plaintiff to address to his case manager; needs to know his upcoming court date; requests a 90-day review; Plaintiff is not STG; Plaintiff needs help to get his appeal and go home; Staff Response 6/25/14: for resisting officer, disorderly conduct; trial date is 6/30/14; "I am not doing a 90 day review!" (Doc. No. 63-6 at 41)

7/1/14           <u>Request for Information</u> to Wall (Mailroom Programs Supervisor): regarding denied request to receive digital records from SSA; Staff Response by McRae 7/2/14: "We are waiting on the review committee to respond." (Doc. No. 63-7 at 32)

8/1/14           <u>Request for Information</u> (blank); Staff Response by Thompson 8/1/14: "If you have a box it will be taken out of your account but when it's an envelope you supply the stamps. The only time we pay is when your ship it to our facility. I will mail you letter on Monday. I have no control over NCDOC policy. FB nor any social media is allowed. No copies of anything from the internet is allowed. Re: your brother Maurice – write to Mr. Mitchell he has the authority to approve your correspondence. We handle all mail with care and apologize if there is any oversight" (Doc. No. 63-7 at 33)

8/19/14          <u>Request for Information</u> to Thompson Mailroom: Plaintiff wants to know where the letter that was sent to him and was rejected because of a Facebook message was mailed to; has anyone seen records pertaining to his "medical disc" that is ready to be mailed; "you all" have had the disc for some time now and only recently told him that he is responsible for the postage; Staff Response by D. Houser 8/20/14: "No one has seen the C31!" (Doc. No. 63-7 at 34)

9/4/14           <u>Letter</u> from Plaintiff to Combined Records: facility refuses to mail legal documents as certified mail for indigent inmates; sent the motions as notarized in February and has received no word from the clerk's office (Doc. No. 63-6 at 45)

9/11/14          <u>Letter</u> from NCDPS to Plaintiff re correspondence addressed to Combined Records: Plaintiff's concerns should be addressed by Plaintiff's case manager and/or staff at the correctional facility (Doc. No. 63-6 at 44)

9/14/14        Request for Information to Smith (Case Manager): prison won't let Plaintiff use certified mail because he is indigent; Plaintiff was told to write Smith about a DC-215 form and DC-215 certificate that is needed for speedy trial motions; Staff Response 9/24/14: "I don't, nor have I ever supplied any forms to inmates to obtain speedy trial" (Doc. No. 63-6 at 47)

10/21/14       Request for Information to Thompson: Plaintiff just heard from Jackie Blackwell that she never received the digital disc from SSA that was rejected by mailroom; Plaintiff wants to know why she did not get it after Plaintiff was told to send stamps or rickets to ensure it got sent home; the disc contained confidential medical information, wants it to be mailed immediately; Staff Response by Thompson 10/24/14: "It was mailed to her on 9/3/14 to the address you provided. **Once mail gets to the Post Office it is out of our control**. You can write the PO in Polkton if you want" (Doc. No. 63-7 at 35) (emphasis added)

11/4/14        Request for Information to Thompson Mailroom: Jackie received everything but the digital records, Plaintiff wants to know what the records consisted of; Staff Response by Thompson 11/5/14: explaining the digital records were on a CD and that it was rejected by McRae because Plaintiff cannot have a CD (Doc. No. 63-7 at 36)

11/6/14        Cashless on the Net four first class stamps (Doc. No. 56-5 at 5)

11/9/14        Request for Information to Thompson Mailroom: still inquiring about the digital records; Staff Response by Thompson 11/10/14: mail was sent to the address Plaintiff provided on 9/3/14 (Doc. No. 63-7 at 37)

11/11/14       Request for Information to Thompson Mailroom: this is not a USPS issue, it is that his people received everything but the disc; McRae fails to respond; someone is at fault here; the answer is somewhere in the mailroom; Plaintiff believes McRae knows where the records are; Staff Response by Thompson 11/12/14: the disc was mailed 9/3/14 (Doc. No. 63-7 at 38)

11/14/14       Cashless on the Net one first class stamp (Doc. No. 56-5 at 6)

11/26/14       Cashless on the Net one first class stamp (Doc. No. 56-5 at 7)

12/22/14       Cashless on the Net two first class stamps (Doc. No. 56-5 at 8)

12/30/14       Cashless on the Net three first class stamps (Doc. No. 56-5 at 9)

1/5/15         Cashless on the Net two first class stamps (Doc. No. 56-5 at 11)

1/15/15        Cashless on the Net one first class stamp (Doc. No. 56-5 at 12)

18

| | |
|---|---|
| 2/2/15 | <u>Outgoing Mail Log</u> (legal) to NCPLS Raleigh (Doc. No. 56-6 at 2) |
| 2/3/15 | <u>Cashless on the Net</u> two first class stamps (Doc. No. 56-5 at 13) |
| 2/3/15 | <u>Outgoing Mail Log</u> (legal) to US District Court Charlotte (Doc. No. 56-6 at 3) |
| | <u>Outgoing Mail Log</u> (legal) to "S. Nicole Blackwell (Attor) (Doc. No. 56-6 at 3) |
| 2/5/15 | <u>Outgoing Mail Log</u> (legal) to Van Winkle Law Firm (Doc. No. 56-6 at 4) |
| 2/9/15 | <u>Cashless on the Net</u> one first class stamp (Doc. No. 56-5 at 14) |
| | <u>Outgoing Mail Log</u> (legal) to Combine Records Raleigh (Doc. No. 56-5 at 5) |
| | <u>Outgoing Mail Log</u> (legal) to A.J. Allison (Attor) (Doc. No. 56-5 at 5) |
| 2/11/15 | <u>Cashless on the Net</u> one first class stamp (Doc. No. 56-5 at 15) |
| | <u>Outgoing Mail Log</u> (legal) to Pavl Herzog (Attor) (Doc. No. 56-6 at 6) |
| 2/12/15 | <u>Cashless on the Net</u> two first class stamps (Doc. No. 56-5 at 16) |
| 2/18/15 | <u>Cashless on the Net</u> one first class stamp (Doc. No. 56-5 at 17) |
| 2/19/15 | <u>Outgoing Mail Log</u> (legal) to NC Industrial Comm. (Doc. No. 56-6 at 7) |
| 2/20/15 | <u>Outgoing Mail Log</u> (legal) to NCPLS (Doc. No. 56-6 at 8) |
| | <u>Outgoing Mail Log</u> (legal) to NCPLS (Doc. No. 56-6 at 8) |
| 2/22/15 | <u>Request for Information</u> to Captain Mims: Plaintiff has been placed "over here for no reason," Plaintiff is not STG; an **officer refused to mail sealed letters**, **has not received mail since he has been over here**, for over a month; Plaintiff never received censorship notification; Staff Response by Mims 2/25/15: "Please be advise that **I will talk with the Unit Manager and advise him that you are not STG, so therefore your mail can be sealed when sent out**." (Doc. No. 63-8 at 18) (emphasis added) |
| 2/24/15 | <u>Cashless on the Net</u> one first class stamp (Doc. No. 56-5 at 18) |
| 2/26/15 | <u>Outgoing Mail Log</u> (legal) to NCPLS (Doc. No. 56-6 at 9) |
| 3/10/15 | <u>Cashless on the Net</u> four first class stamps (Doc. No. 56-5 at 19) |
| 3/11/15 | <u>Cashless on the Net</u> one first class stamp (Doc. No. 56-5 at 20) |

| | |
|---|---|
| 3/12/15 | <u>Request for Information</u> to Thompson Mailroom: **Plaintiff's mail is being tampered with** and Thompson is the one coming around with the legal cart; Thompson's colleagues were not professional but Thompson always responded: Staff Response by Thompson 3/13/15: "I only pass out legal mail" (Doc. No. 63-7 at 39) (emphasis added) |
| 3/13/15 | <u>Cashless on the Net</u> two first class stamps (Doc. No. 56-5 at 21) |
| 3/19/15 | <u>Cashless on the Net</u> two first class stamps (Doc. No. 56-5 at 22) |
| 3/20/15 | <u>Email</u> from David Aaron, Lanesboro Correctional Captain, Progressive Housing Unit [recipient redacted] re Mail: <u>Effective immediately</u>, Picking up mail **<u>will only</u>** be conducted by one staff member for each side of Anson Unit. The staff member that is responsible for making rounds during the **<u>2200-0000</u>** hour is the designee responsible for collecting the mail. The reason for this time, is it should not be interrupted by other activities and with the round officer picking the mail up, management can look back at any certain day and see what staff was responsible for collecting the mail that day. **<u>The mail will not be accepted by staff at any other point during the day or night</u>**. Passing out mail will be conducted on night shift only. Secretary Ms. Martin will bring the mail down and place the mail in the management's office, then that mail will be delivered by management to the night shift sergeant. The following staff members have been selected by management as the designated staff member responsible for delivering all mail for the unit; S[redacted] Morrison 2A, in her absence S[redacted] Kendall 2A; W[redacted] McInnis 2B in his absence, C[redacted] Haigler 2B. If mail is found to be undeliverable due to inmate movements or being shipped, please ensure that the inmate is indeed gone or moved and get it to the correct unit. **<u>This has nothing to do with the passing of state material, to include daily forms, hygiene, or other control materials</u>**. Ms. Martin will be the only member removing the mail from the mailboxes, which is then stamped and taken to the mailroom by 1030 hours each day. With this process, the hand exchange of the mail should be at a minimal to lower the risk of losing or misplacing it." (Doc. No. 63-5 at 84) |
| 9/20/15 | <u>Letter</u> from Plaintiff to Clerk's Office: Plaintiff sent a § 1983 lawsuit packet in July, then wrote about the status of his claim. Requesting status. (Doc. No. 63-7 at 27) |
| 11/9/15 | <u>Request for Information</u> to Houser Mailroom: wants to know if the policy is still in place about rejected mail and whether J'Adore **magazines** are on the ban list; wants to know if Plaintiff's magazine was rejected because he never received a rejection slip; a family member sent Plaintiff a catalogue that was not banned but Plaintiff never got it or a notice of rejection; Staff Response by D. Houser 11/12/15: they have not received or rejected anything, Plaintiff has received every magazine that has come in (Doc. No. 63-8 at 1) (emphasis added) |
| 11/17/15 | <u>Request for Information</u> to D. Houser Mailroom: Plaintiff has been waiting for a **certified mail receipt** that was sent to Bruce Cunningham in a box; it has not been |

deducted from Plaintiff's account; Plaintiff has been stressing Mr. Ingram for two weeks; Plaintiff knows that incoming and outgoing mail has to be documented; if it has not been sent off, please return it to Plaintiff; if it has been mailed then Plaintiff needs the certified receipt for verification; Staff Response by D. Houser 11/18/15: "I need the date you sent it up here so I can check this." (Doc. No. 63-7 at 15)

12/18/15     <u>Letter</u> from TheeBLVD to Plaintiff: 4 issues of magazine shipped 12/2/15 (Doc. No. 63-8 at 15)

1/5/16     <u>Request for Information</u> to D. Houser Mailroom: Plaintiff sent a manila envelope out **certified mail** with a DC-160 attached to it, signed by Sgt. Lambert but the receipt has not been given to Plaintiff and it does not show on Plaintiff's weekly receipt that it was mailed out; please check the status; Plaintiff received notification from Pole Blvd Publications that they sent 2 magazines in December that Plaintiff has not received and Plaintiff has not received a censorship rejection notice; Staff Response by J. Houser: "Mailed out on 1/6/16" (Doc. No. 63-7 at 17) (emphasis added)

1/11/16     <u>Request for Information</u> to D. Houser Mailroom: thanks for the response about certified mail receipt but there was no response about notification from Pole Blvd about Plaintiff's subscriptions; Houser said they have sent 2 magazines since 12/2/15 but Plaintiff did not receive any or a rejection notification; Staff Response by D. Houser 1/11/16: "All magazines are sent to Units daily mon-fri when we receive them (Doc. No. 63-8 at 2) (emphasis added)

1/17/16     <u>Statement by Witness</u> by Anthony Allen, Correctional Sergeant: "During May 2016, I Sergeant Anthony Allen was passing out mail in the pods, when I gave 2 magazines to [Plaintiff]. At that time he stated to me that it was supposed to be 3 magazines. I stated to him 'I gave him what was present in the mail basket.' There was only two magazines present for [Plaintiff] and that is all he received." (Doc. No. 63-8 at 7) (emphasis added)

2/11/16     <u>Letter</u> from TheeBLVD to Plaintiff: mailing dates of 3 magazine issues; they have not received any rejected magazines or notices of rejection, please check with mailroom (Doc. No. 63-8 at 16)

2/16/16     <u>Request for Information</u> to D. Houser/ E. Paul – Mailroom: re book that Plaintiff sent out certified mail but was not given a DC-160, "has it been mailed," asking questions about certified mail; Staff Response by E. Paul on 2/18/16: "Went out 2-12-16" (Doc. No. 63-6 at 1) (emphasis added)

    <u>Request for Information</u> to D. Houser, E. Paul Mailroom: re why Plaintiff is not receiving the items that are prison-friendly and that Plaintiff paid for, and for which Plaintiff has not received a rejection letter; requests documentation for the last six months [staff response section blank] (Doc. No. 63-8 at 3)

| 2/21/16 | <u>Request for Information</u> to E. Paul, D. Houser Mailroom: Plaintiff is sending out a lot of mail; Plaintiff is not receiving the things he is supposed to get and has paid for; wants procedures for documenting incoming publications; Staff Response by D. Houser 2/22/16: "All mail is sent out daily mon-Friday. If you receive a book you will have to sign for it in the DC-218 log book." (Doc. No. 63-8 at 4) |
|---|---|
| 2/23/16 | <u>Request for Information</u> to D. Houser, E. Paul Mailroom: Plaintiff has been having numerous issues with the mail; Houser said the certified mail was sent the 12th, wants to know if $2.72 was deducted from his account; wants to know why he has not received his DC-160 or stamped copy yet; it has been almost 2 weeks and Plaintiff has not received anything to verify it was actually sent or received; Staff Response by D. Houser 2/25/16: "Ms. McAllister should have a copy of DC-160" (Doc. No. 63-7 at 18) |
| 2/25/16 | <u>Request for Information</u> to D. Houser Mailroom: Houser is saying that McAllister should have the DC-160 but she told Plaintiff to check with mailroom; "Surely it wasn't just thrown away?"; Plaintiff is still **waiting for the green and white receipt**, and the green and black one showing it reached its destination; Plaintiff has yet to receive these items for any of his certified mail; Staff Response by E. Paul 3/1/16: "Check w/ Ms. McAllister or Record Ms. Stegall. We don't have copies of 160's" (Doc. No. 63-8 at 6) |
| 3/1/16 | <u>Request for Information</u> to Stegall (Records Keeper): E. Paul directed Plaintiff to get records of a DC-160 for mail that was sent out 1/8/16; would like to know why he has not received any postage stamped certified or return receipt verifying the mail was sent; needs to contact his family; Plaintiff is not STG; Staff Response: "You need to talk to your unit manager about making a copy of the 160 you need! I am not allowed sorry!" (Doc. No. 63-7 at 19) |
| 3/9/16 | <u>Request for Information</u> to Stegall: Unit management directed Plaintiff to the secretary, who directed him to the mailroom, who directed him back to the secretary, and then to Stegall; who keeps a record of outgoing legal mail, certified mail, or incoming packages; Staff Response by P. Stegall 3/11/16 "No I do not have anything to do with mail or packages!! Only mailroom staff!" (Doc. No. 63-7 at 20) |
| 3/29/16 | <u>Request for Information</u> to Mailroom: "I was told to contact you all because the secretaries no longer hold these items. I need 6 certified stamp tickets and I need them ASAP;" 3/31/16 response by E. Paul: "Send the mail up with the form to take out of your account cannot send the cards to you. P.S. I still need the form I sent down for you …." (Doc. No. 63-6 at 3) |
| 4/11/16 | <u>Memorandum</u> from Mabry to Plaintiff re April 1st 2016 Letter, Subject: Legal/Personal Mail: "Currently there is two pieces of mail being processed for you as certified mail. You have recently begun to send all of your personal and legal mail out as certified mail. Certified mail has to be weighed at the post office and |

then processed in accordance to the cost the USPS office quotes. You send mail out as certified mail, in which the mailroom has reported the return/receiving acceptance cards have not been returned. This would be a sign that whomever the mail is addressed too, has not signed and received the mail or they are refusing to accept the certified mail from you. **The mailroom as confirmed that there is no mail for you that is being held or censored**…." (Doc. No. 63-7 at 24); Certified mail receipts for US District Court and Caprea Nichols Atty attached (Doc. No. 63-7 at 25) (emphasis added)

4/24/16      Request for Information to D. Houser/E. Paul/ Mailroom: "I need you to track down these **3 certified letters** for me…;" Staff Response by E. Paul 4/25/16: "Have not received Green Cards Back yet in the mail." (Doc. No. 63-6 at 4)

                Request for Information to Mabry – Mailroom: "I'd like for this LEGAL MAIL to Caprea Nichols to be sent out CERTIFIED MAIL RETURN RECEIPT AND RESTRICTED DELIVERY PLEASE;" Staff Response by E. Paul 4/29/16: "Mailed 4/28-16" (Doc. No. 63-6 at 8)

                Letter from Plaintiff enclosing money order, listing magazines for purchase (Doc. No. 63-8 at 10)

4/26/16      Disposition of Personal Property notice that unauthorized/excessive personal property items will not be retained; Plaintiff signature requesting mailing to Jennifer Edwards (Doc. No. 63-6 at 5)

                Request for Information to Mabry, E. Paul, D. Houser, Mailroom: "I need RESTRICTED DELIVERY and return receipt on this certified mail to Ms. Jennifer Edwards;" Staff Response by E. Paul 4/27/16: "Per Mr. Mabry only Legal Mail can go certified. You need (3) stamps to mail." (Doc. No. 63-6 at 7) (emphasis added)

                Request for Information to Mabry, E. Paul, D. Houser, Mailroom: "I need certified mail sent to the United States District Court. Return Receipt Requested;" Staff Response by E. Paul 4/29/16: "Mailed 4-28-16" (Doc. No. 63-6 at 10)

4/28/16      Request for Information to E. Paul Mailroom: why was personal mail sent back, refusing to send it certified when Plaintiff has the money to pay for it; Plaintiff is no longer indigent; this is the fifth or sixth time the mail has changed since Plaintiff has been here; the other day Plaintiff sent a manila envelope certified mail to Caprea Nichols, was it mailed for him because Plaintiff's mail was returned today or yesterday; Staff Response by E. Paul 5/3/16: "**Mr. Mabry said only legal mail can go certified now.** Not regular mail." (Doc. No. 63-7 at 21) (emphasis added)

5/4/16       Inmate Request to Mabry: Plaintiff has been told that Mabry decided not to send off certified mail even if an inmate has funds unless it's legal; this is not stated in the policy manual and resulted in confusion; this practice is not fair to prisoners; Plaintiff needs receipts to the district court and Caprea Nichols, both of which were

charged to his account (Doc. No. 63-7 at 22)

Response by Mabry: "Certified mail is not addressed in any manual specifically … but it is covered by the same policy as special draws, which states administration is to use good judgment in approving what funds are to be withdrawn from an inmates trust fund account. **Certified mail has become an issue with the mailroom and mandated new procedures to be put into place**. Inmates are using certified mail without justification to send out greeting cards and personal mail. Plus inmates who utilize certified mail, feel that the mailroom should track their correspondence, which is not policy and procedure. Certified mail is justified in sending legal mail, legal documentation, or important property only. Personal mail such as greeting cards, and personal written letters can be sent as normal as first class mail. The time and documentation involved in processing certified mail is not valid for personal mail. The mailroom and trust fund will process it for legal mail and important documentation as long as the inmates notify or identify the need for it to be certified. The receipts are kept in trust fund attached to the withdraw check, as the documentation to the disposition of the funds that were withdrawn from an inmates account. Copies of the receipts can be forwarded to the inmates upon request. The mailroom has been instructed to forward the green signature cards to the inmates." (Doc. No. 63-7 at 23) (emphasis added)

5/26/16    Request for Information (handwritten) to E. Paul – Mailroom: re response about request for green cards on 4/29/16, saying he has received the one from J. Edwards dated 4/13/16 but the ones from Caprea Nichols 4/13/16 and Kiona Gaither 4/6/16 are still missing, please track them; Staff Response by E. Paul 5/3/16 "Have not received back the other (2) yet back …. But received Green Card back from United States District Court Charlotte, NC" (Doc. No. 63-6 at 12)

5/30/16    Request for Information to Houser Mailroom: DHO Allen told Plaintiff to contact Houser to find out exactly how many magazines came to Plaintiff last Friday; Staff Response by D. Houser 6/1/16: "We do not log magazines only books" (Doc. No. 63-8 at 5)

6/16/16    Letter from Plaintiff to Southern Comforts placing an order from the catalog (Doc. No. 63-6 at 19)

           Letter from Plaintiff to CAN Entertainment stating this is the third time he has tried to order pictures (Doc. No. 63-6 at 20)

6/19/16    Request for Information to Mabry: requesting information about withdrawals, list of things Plaintiff ordered (Doc. No. 63-6 at 22)

7/11/16    Notice to Inmate of a Statewide Disapproved Publication magazine "Thick in all the right places issue #7"; Inmate Signature, request for remailing to Kimberly Blackwell; handwritten note "mailed 7-14-16" (Doc. No. 56-16 at 3) (emphasis added)

7/31/16      Request for Information to Mailroom: Plaintiff mailed off indigent legal mail last week, asking to know why the mailroom is now saying Plaintiff is not on the list when it is obvious he is indigent; Staff Response by Mailroom 8/2/18: "**You have a job as a housing janitor. Therefore you were not on the indigent legal list on 7-31-18**. Today your are on the legal list so I am retrieving your ticket" (Doc. No. 63-6 at 23) (emphasis added)

11/18/16    Request for Information to D. Houser Mailroom: the certified mail was processed 11/12 although it was in Mr. Ingram's possession from the beginning of November; he said he sent it to the mailroom on a Friday the 6th so someone had to sign for it; it was a massive stack of legal papers; please locate the certified mail receipt so Plaintiff can verify his attorney received it; Staff Response by D. Houser 11/20/15: "11-12-15 mailed out Bruce Cunningham (Attor) … **could not do certified/return receipt because it was in a box**." (Doc. No. 63-7 at 16) (emphasis added)

3/8/17       Request for Information to Mailroom: Plaintiff sent a manila envelope of legal mail to his fiancee who has power of attorney on Monday; Sgt. McDonald signed it; Plaintiff needs to know if it was mailed off: Staff Response by E. Paul: "Mailed 3/9/17" (Doc. No. 63-7 at 28)

## II.    LEGAL STANDARDS

### (1)    <u>Summary Judgment</u>

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving

party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

Although the court does not make a credibility determinations on summary judgment review, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Smith v. Ozmint, 578 F.3d 246, 254 (4th Cir. 2009)) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).

When confronted with cross-motions for summary judgment, "the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003).

## (2) **Mail**

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech…." U.S. Const. Amend I. The First Amendment applies to the states through the Fourteenth Amendment.

See Everson v. Bd. of Educ., 330 U.S. 1, 15 (1947). A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Pell v. Procunier, 417 U.S. 817, 822 (1974); Pittman v. Hutto, 594 F.2d 407, 410 (4th Cir. 1979). Legitimate penological objectives include maintaining safety and security and saving scarce prison resources. United States v. Stotts, 925 F.2d 83, 86 (4th Cir. 1991). When a prison restriction infringes upon an inmate's First Amendment rights, the alleged infringement "must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979) (citing Jones v. N.C. Prisoners' Labor Union, 433 U.S. 119, 129 (1977)). A court assesses the reasonableness of a prison regulation that impinges on a prisoner's constitutional rights by considering: (1) whether there is a valid, rational connection between the regulation and the legitimate governmental interest put forward to justify it, (2) whether there are any alternative means of exercising the right that remain open to inmates, (3) the impact that accommodation of the asserted constitutional right will have on guards, other inmates, and prison resources generally, and (4) whether there are ready alternatives for furthering the governmental interest. Turner v. Safley, 482 U.S. 78, 90-92 (1987). In noting the delicate nature of prison management, the Supreme Court has "afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." Thornburgh, 490 U.S. at 408 (citation omitted).

Isolated incidents of mail mishandling do not rise to the level of a constitutional violation. See Buie v. Jones, 717 F.2d 925, 926 (4th Cir. 1983) ("a few isolated instances of plaintiff's [legal] mail being opened out of his presence" that were "either accidental or the result of unauthorized subordinate conduct ... were not of constitutional mandate."); Pearson v. Simms, 345 F.Supp. 2d

515, 519 (D. Md. 2003), *aff'd*, 88 Fed. Appx. 639 (4th Cir. 2004) ("occasional incidents of delay or non-delivery of mail" are not actionable under § 1983).

**(3)**     **<u>Qualified Immunity</u>**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. <u>Am. Civil Libs. Union of Md., Inc. v. Wicomico County, Md.</u>, 999 F.2d 780, 784 (4th Cir. 1993) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted).

In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in <u>Saucier</u> is "often appropriate," it is not mandatory. <u>Pearson</u>, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. <u>Id.</u>

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff

must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. <u>Thompson v. Commonweath of Va.</u>, 878 F.3d 89, 97 (4th Cir. 2017) (citing <u>Pearson</u>, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson</u>, 555 U.S. at 231.

To find a right is clearly established does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." <u>Amaechi v. West</u>, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." <u>Id.</u> at 362-63 (internal quotation omitted). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. <u>White v. Pauly</u>, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) (citing <u>United States v. Lanier</u>, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." <u>Id.</u> at 741.

### III.    DISCUSSION

Plaintiff argues that Defendants violated his First Amendment rights with regards to his mail in a number of ways that will be addressed in turn.

First, Plaintiff claims that he was not allowed to send registered/certified mail while he was indigent. Defendants submitted evidence showing that policy does not provide for certified mail

for indigent inmates and that only first-class postage is permitted. Defendants have provided evidence that this policy was due to a legitimate penological objective, explaining that the fees for certified signature and return receipt can run from $6.00 to $8.00 per piece based on weight. See Stotts, 924 F.2d at 86 ("the savings of scarce prison resources" is a legitimate penological objective). Plaintiff was provided an alternative means of exercising his First Amendment rights in that the prison provided him free first-class stamps while he was indigent. Plaintiff has failed to demonstrate how the regular mailing of this legal mail, as opposed to certified or registered mail, while he was indigent violated his rights. Further, Plaintiff was informed in May 2014 that he could request an exception if he could show that a court order required him to use certified or registered mailing. (Doc. No. 63-7 at 14). Plaintiff fails to demonstrate that he ever requested an exception that was supported by a court order that Defendants denied. Plaintiff contends that Defendant Mabry violated his rights by later barring non-indigent inmates from sending items certified or registered mail without sending a memorandum first, and this change was an attempt to lie for Houser and Paul. Defendants have submitted evidence that Mabry decided to modify the availability of certified and registered mail, which is left to the facility's discretion, due to undue burdens on the mailroom and staff. Plaintiff has failed to refute Mabry's legitimate reason for the policy change or present evidence that Mabry was attempting to lie for Houser and Paul. See Stotts, 924 F.2d at 86.

Second Plaintiff contends that Defendants Houser and Paul threw out certified mail receipts. Defendants submitted evidence that neither the facility nor its mailroom are able to determine when the signature cards would return to the facility, or even if the individual that the mail was sent to accepted or signed for the certified mail, and that the green signature cards were forwarded to Plaintiff when they arrived in the incoming mail. (Doc. No. 56-1 at 6). Plaintiff has

failed to refute the foregoing or demonstrate how his failure to receive certified mail receipts for certain items shows that Defendants violated his rights.

Third, Plaintiff contends that Defendants Houser and Paul sent out his mail as regular mail although Plaintiff paid to send it certified/return receipt. Defendants have submitted evidence demonstrating that several pieces of mail were sent out as certified/ return receipt while Plaintiff was not indigent. Plaintiff fails to come forward with evidence demonstrating that Defendants charged him for mail yet failed to send out his mail or how, in doing so, they violated his First Amendment rights. See, e.g., Pearson, 345 F.Supp. 2d at 519 (occasional incidents of delay or non-delivery of mail are not actionable under § 1983); Lloyd v. MacNeish, 2015 WL 1391476 (E.D.N.C. March 25, 2015) (granting summary judgment for defendants where plaintiff's allegations of isolated incidents of mishandling of legal mail failed to raise to the level of a constitutional violation).

Fourth, Plaintiff alleges that Defendants Houser and Paul unjustifiably held Plaintiff's mail, that McAllister threw away Plaintiff's letters to family and friends, and that he did not receive some of the magazines he ordered. Defendants have presented evidence that Plaintiff mailed out a large quantity of mail during the relevant times, that they abided by applicable policies and SOPs to the best of their ability, and that they did not knowingly discard any of Plaintiff's mail or fail to deliver his magazines. Plaintiff has failed to refute the foregoing by showing that Defendants purposefully violated his rights. See, e.g., Buie, 717 F.2d at 926 (affirming summary judgment for defendants where the opening of plaintiff's mail outside of his presence involved "a few isolated instances" which did appear to have been contrary to the policy of the jail and to have been either accidental or the result of unauthorized subordinate conduct and "were not of constitutional magnitude").

Finally, Plaintiff alleges that McAllister provided inadequate notary services that somehow interfered with his First Amendment rights. The evidence demonstrates that Plaintiff sent out two notarized motions in February 2014 and then asked McAllister to notarize a document in May 2014. Assuming that Defendant McAllister failed to notarize a single document in May 2014, Plaintiff fails to explain how this isolated incident violated his First Amendment rights. See, e.g., Lloyd, 2015 WL 1391476 at *11 (plaintiff could not establish a constitutional violation where he failed to allege an injury from the alleged mishandling of his legal mail).

Plaintiff has failed to demonstrate that a genuine dispute of material fact exists that Defendants violated his First Amendment rights.

Plaintiff has also failed to demonstrate that Defendants violated any of his constitutional rights or that their actions were unreasonable in light of clearly established federal law, and therefore, Defendants are therefore entitled to qualified immunity.

Defendants' Motion for Summary Judgment will therefore be granted.

## IV.     CONCLUSION

Based on the foregoing, Plaintiff's Motion to Resubmit is granted, Defendants' Motion for Summary Judgment is granted, and this case will be closed.

**IT IS, THEREFORE, ORDERED** that:

1. Plaintiff's *pro se* Letter, (Doc. No. 64), is construed as a Motion to Resubmit his Response to Defendants' Motion for Summary Judgment and is **GRANTED** insofar as Plaintiff's Response is accepted as timely filed.

2. Defendants' Motion for Summary Judgment, (Doc. No. 54), is **GRANTED.**

3. The Clerk of Court is instructed to close this case.

Signed: January 20, 2020

Frank D. Whitney
Chief United States District Judge